## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| RACHEL HELLER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | 1:23-CV-04595-ELR |
| | * | |
| GLASS ENTERTAINMENT GROUP, | * | |
| LLC, | * | |
| | * | |
| Defendant. | * | |
| | * | |

_____

## ORDER

_____

Presently before the Court is Plaintiff Rachel Heller's Motion for Order for Certificate of Immediate Review [Doc. 38], Defendant Glass Entertainment Group LLC's ("Glass") Motion for Reconsideration [Doc. 43], and Plaintiff's Motion for Entry of Judgment under Rule 54(b) [Doc. 44]. The Court sets out its reasoning and conclusions below.

## I.    Background[1]

This case concerns Plaintiff's various claims against Defendant Glass and former Defendants ABC News, Inc. ("ABC"), and Hulu, LLC, regarding the "unwanted intrusion and misappropriation of her image and likeness" in a three-part docuseries that was produced by Defendant Glass and former Defendant ABC and streamed by former Defendant Hulu. See Compl. [Doc. 1]; Am. Compl. at 1–4 [Doc. 28].

According to the Complaint, Plaintiff "was the innocent victim of repeated sexual abuse by Spencer Herron, one of her teachers, while she attended" Kell High School in Cobb County, Georgia. Am. Compl. at 1. "Plaintiff reported Herron's sexual abuse to authorities in Cobb County[,] which led to Herron's arrest, conviction, and time served in prison." Id. at 2. "After Herron's arrest, Herron's then-wife, Jenifer [Faison], discovered that Herron had had sexual relations with approximately sixty (60) women during their seven (7) years of marriage." Id. at 2. Various news outlets reported details related to Herron's arrest and conviction. [See Doc. 23, Ex. A, Ep. 3 at 1:11–32, 14:07–42]. "These and other facts regarding

---

[1] The Court refers to its August 16, 2024 Order for additional factual and procedural background. [Doc. 37]. For purposes of Defendant Glass's Motion for Reconsideration, which concerns the Court's ruling on Defendant Glass's Motion to Dismiss, the Court accepts the allegations in the Complaint as true and construes them in the light most favorable to Plaintiff. See Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003).

Plaintiff and [Faison's] ordeals led to a podcast series produced by Defendant Glass," which is titled "Betrayal" (the "Betrayal Podcast"). Am. Compl. at 2.

During the production of the Betrayal Podcast, Plaintiff reached an oral agreement with Defendant Glass (the "Podcast Agreement") to participate in a recorded interview "only" upon Defendant Glass's express agreement "that the audio recording of the interview would be used *solely* for the podcast." See Am. Compl. ¶ 13 (emphasis in original). Defendant Glass "agreed to" Plaintiff's condition. Id. The Betrayal Podcast was released in April 2022 and "quickly skyrocketed to the No. 1 podcast in America across all major platforms and amassed more than eight million downloads." Id. ¶ 16.

Among other things, the Betrayal Podcast details Herron's "textbook grooming and predator behavior." [See, e.g., Doc. 23, Ex. B, Ep. 3 at 17:15–33; Ep. 8 at 13:05–14:59]. It also contains Plaintiff's explanation that she agreed to be interviewed "to help with the healing process" and to "defend [her]self to the public eye with [her] own words." [See id. Ep. 3 at 4:50–5:35]. Additionally, in the Podcast, Plaintiff discusses a civil lawsuit she filed against her school related to Herron's abuse and the harmful impact of the school "victim shaming" her in court. [Id. at 29:20–42]. She also reads the letter that she submitted to the parole board urging them to deny Herron parole. [Id. Ep. 8 at 13:05–14:59]. Following the Podcast's "enormous success," Defendant Glass and former Defendant ABC decided to adapt

the Betrayal Podcast into a TV docuseries (the "Docuseries"). Am. Compl. ¶¶ 16–18. Faison, Herron's ex-wife, was "heavily involved" in the production of the Docuseries and "often acted" as Defendant Glass's agent. Id. ¶ 19–20.

Unrelated to the production of the Betrayal Podcast or Docuseries, the University of North Georgia ("UNG") invited Plaintiff and Faison "to give presentations on their respective ordeals involving [] Herron to a criminal justice class" at UNG on November 17, 2022 (the "UNG Presentation"). Am. Compl. ¶ 21. Approximately two weeks before the UNG Presentation, Plaintiff met with Faison and learned that Defendant Glass planned to film the UNG Presentation for the Docuseries. Id. ¶ 22. During that meeting, Plaintiff expressed reluctance about being filmed, and Faison told Plaintiff that she should not be concerned because Plaintiff "would have the ultimate say as to whether the recording of her would be used" in the Docuseries. Id. Specifically, Faison told Plaintiff that she and Defendant Glass "would never be able to use footage of [Plaintiff] if [she] didn't sign a release." Id. Plaintiff alleges that her conversation with Faison created an oral agreement (the "Docuseries Agreement") because she "would not have participated in the filming . . . if she had not been assured by Faison, acting as agent for [Defendant] Glass, that she was in full control of whether any [portion her] presentation would appear" in the Docuseries. See id. ¶ 24.

Ultimately, Plaintiff participated in the UNG Presentation, and Defendant Glass filmed her, knowing that she had not consented to the use of any footage of her in the Docuseries and that Faison had told Plaintiff that it was "safe" for Plaintiff "to go forth with filming" because Plaintiff would have the "ultimate say" regarding any such footage. Am. Compl. ¶ 25. Plaintiff later told Jon Hirsch, Senior Vice President & Executive Producer for Defendant Glass and Executive Producer and Director of the Docuseries, that she did not consent to Defendant Glass's use of any footage or images taken of her during the UNG Presentation. See id. ¶ 42. Nevertheless, almost four months later, Hirsch informed Plaintiff that footage of her from the UNG Presentation had been included in the production of the Docuseries. Id. ¶ 44. Less than a week later, former Defendant Hulu began streaming the Docuseries, which contained multiple video clips of Plaintiff speaking at the UNG Presentation. Id. ¶ 47; [see Doc. 23, Ex. A].

Plaintiff subsequently initiated this action, alleging six Counts:

1.   Appropriation of Plaintiff's likeness against Defendant Glass and former Defendants ABC and Hulu (Count I);
2.   Breach of contract against Defendant Glass as to the Podcast Agreement and Docuseries Agreement (Count II);
3.   Specific performance against Defendant Glass as to the Podcast Agreement and Docuseries Agreement (Count III);
4.   Promissory estoppel against Defendant Glass as to the Podcast Agreement and Docuseries Agreement (Count VI);
5.   Unjust enrichment against former Defendants ABC and Hulu (Count V); and

      6.      Punitive damages against Defendant Glass and former Defendants ABC and Hulu (Count VI).

Am. Compl. ¶¶ 50–97.

Defendant Glass, individually, and former Defendants ABC and Hulu, jointly, moved to dismiss the Complaint. [Docs. 31, 32]. On August 16, 2024, the Court granted former Defendants ABC and Hulu's motion to dismiss in its entirety, thereby dismissing Counts I, V, and VI as to those Defendants and dismissing them as Defendants in this case. [Doc. 37 at 39]. The Court also granted in part and denied in part Defendant Glass's motion to dismiss (the "MTD Order"). [Id.] Specifically, the Court granted Defendant Glass's motion to dismiss regarding Plaintiff's claims for breach of contract as to the Podcast Agreement and Docuseries Agreement (Count II) and specific performance as to the Docuseries Agreement (Count III). [Id.] The Court denied Defendant Glass' motion in all other respects. [Id.] Accordingly, Plaintiff's claims against Defendant Glass for appropriation of Plaintiff's likeness (Count I), specific performance as to the Podcast Agreement (Count III), promissory estoppel (Count IV), and punitive damages (Count VI) survived. [See id.]

Subsequently, Defendant Glass filed its Motion for Reconsideration. [Doc. 43]. In that motion, Defendant Glass contends that the Court's MTD Order contains a "clear error" of law related to Plaintiff's appropriation claim. [Doc. 43-1 at 1]. Plaintiff responded in opposition, and Defendant Glass replied. [Docs. 48; 50].

Additionally, Plaintiff filed her instant Motion for Certificate of Immediate Review. [Doc. 38]. Defendant Glass responded in opposition, and Plaintiff did not reply. [Doc. 42]. Instead, Plaintiff filed her Motion for Entry of Judgment Pursuant to Federal Rule of Civil Procedure 54(b). [Doc. 44]. Defendant Glass responded in opposition, and Plaintiff replied. [Docs. 47, 49]. The Court begins with Defendant Glass's Motion for Reconsideration.

## II.    Defendant Glass's Motion for Reconsideration

### A.    Legal Standard

Reconsideration is only appropriate where there is (1) newly discovered evidence, (2) an intervening development or change in controlling law, or (3) a need to correct a clear error of law or fact. See Bryan v. Murphy, 246 F. Supp. 2d 1256, 1258–59 (N.D. Ga. 2003); see also Kramer v. Conway, 962 F. Supp. 2d 1333, 1356 (N.D. Ga. 2013). Accordingly, motions for reconsideration should be filed only when "absolutely necessary." Bryan, 246 F. Supp. 2d at 1258; accord LR 7.2(E), NDGa. They should not be used "as a vehicle to present new arguments or evidence that should have been raised earlier, introduce novel legal theories, or repackage familiar arguments to test whether the Court will change its mind." Pediatric Med. Devices, Inc. v. Ind. Mills & Mfg., Inc., 961 F. Supp. 2d 1241, 1243 (N.D. Ga. 2013). Whether to grant reconsideration is committed to the sound discretion of the district

court. Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.,

225 F.3d 1208, 1216 (11th Cir. 2000).

### B.    Discussion

Defendant Glass's Motion for Reconsideration concerns the Court's

application of the "newsworthiness" exception to Georgia's invasion of privacy tort

and Plaintiff's related appropriation of likeness claim. [See generally Doc. 43].

Specifically, Defendant Glass contends that the Court erroneously limited the

newsworthiness exception to "contemporaneous news stories" and failed to

recognize the broader public interest in the Docuseries. [Doc. 43-1 at 1]. In doing

so, Defendant Glass argues, the Court "seemingly narrowed the 'newsworthiness'

exception to 'hot news,' a concept that is inapplicable to this case and inconsistent

with Georgia law regarding the right of publicity."[2] [Id. at 1–2]. In its discretion, the

Court agrees with Defendant Glass that reconsideration of its MTD Order is

necessary to correct an error of law or fact. See Fla. Ass'n of Rehab. Facilities, Inc.,

225 F.3d at 1216.

As relevant here, Plaintiff's appropriation of likeness claims falls within one

of the "four species of the tort of invasion of privacy." See Torrance v. Morris Pub.

Grp. LLC, 636 S.E.2d 740, 747 (Ga. Ct. App. 2006) (quoting Cabaniss v. Hipsley,

---

[2] There is "no substantive difference" between the Georgia common law "right of publicity" and
an appropriation of likeness claim. See Somerson v. World Wrestling Ent., Inc., 956 F. Supp. 2d
1360, 1365 (N.D. Ga. 2013). Thus, caselaw pertaining to "the right of publicity" applies to
Plaintiff's appropriation claim. See id.

151 S.E.2d 496, 500 (Ga. Ct. App. 1966)). Because the Georgia common law "right to privacy and corresponding right of publicity are necessarily in tension with the First Amendment's protection of freedom of speech and of the press" and the Georgia state constitution's similar guarantee, "Georgia courts have adopted a 'newsworthiness' exception to the right of publicity." Toffoloni v. LFP Publ'g Grp., LLC, 572 F.3d 1201, 1207 (11th Cir. 2009); see Waters v. Fleetwood, 91 S.E.2d 344, 346 (Ga. 1956) (noting that the right to privacy may "collide with the right of the public to speak, write, and print matters of public interest"). In other words, the newsworthiness exception exists "due to the fact that [Georgia] law considers that the welfare of the public is better subserved by maintaining the liberty of speech and of the press than by allowing an individual to assert his right of privacy in such a way as to interfere with the free expression of one's sentiments and the publication of every matter in which the public may be legitimately interested." Tucker v. News Publ'g Co., 397 S.E.2d 499, 500 (Ga. Ct. App. 1990).

Pursuant to the newsworthiness exception, "where an incident is a matter of public interest, or the subject matter of a public investigation, a publication in connection therewith can be a violation of no one's legal right of privacy." Toffoloni, 572 F.3d at 1207 (quoting Waters, 91 S.E.2d at 348). In other words, there are two ways a publication might fall within the newsworthiness exception: (1) the information relates to an incident of public interest, or (2) the information pertains

to a public investigation. See id. The Court's MTD Order discussed and applied the latter investigation category, but not the broader incident of public interest category.

As to the public investigation category, the Court noted that Georgia courts routinely dismiss invasion of privacy claims when they "involve contemporaneous news stories." [Doc. 37 at 29 n.16]; see Thoroughbred Legends, LLC v. The Walt Disney Co., No. 1:07-CV-1275-BBM, 2008 WL 616253, at *11 (N.D. Ga. Feb. 12, 2008); Tucker, 397 S.E.2d at 500 (holding that information related to criminal matters is newsworthy "*[d]uring* the pendency and continuation of the investigation and *until* such time as the perpetrator of the crime may be apprehended and brought to justice under the rules of our society" (emphasis added)). Because the Docuseries aired several years after Herron's arrest, conviction, and sentencing, the Court declined to dismiss Plaintiff's appropriation of likeness claim based on the public investigation prong of the Georgia common law newsworthiness exception. [Doc. 37 at 30]. However, Defendant Glass's present argument—that the Court failed to recognize the broader public interest in the Docuseries is well-taken. [Doc. 43-1 at 1]. Thus, the Court now considers whether the Docuseries is newsworthy because it relates to an "incident [that] is a matter of public interest." See Waters, 91 S.E.2d at 348.

For a publication to be newsworthy, the Eleventh Circuit has observed that Georgia courts "consistently indicate[]" that a publication of an "incident of public

interest" must be circumscribed by "timeliness or relatedness boundaries."

Toffoloni, 572 F.3d at 1207. For instance,

> in Ramsey v. Georgia Gazette Publishing Company, 164 Ga. App. 693, 297 S.E.2d 94, 96 (1982), the court recognized that the "plaintiff has, albeit unwillingly, become an actor in a public drama." As such, "[d]issemination of information *pertaining to this drama* is no violation of the plaintiff's right of privacy." Id. (emphasis added). Correspondingly, we conclude that the Georgia courts would find that dissemination of information that does not pertain to the "drama" at hand *may* violate an individual's right of privacy. Although the Georgia courts have not said that public scrutiny is circumscribed solely to the details of the newsworthy event itself, the Georgia courts have required reasonable timeliness and relatedness boundaries.

Id. at 1210–11 (emphasis in original). These boundaries are not demanding. They only require that "[s]ome reasonable proportion is . . . to be maintained between the event or activity that makes the individual a public figure and the private facts to which publicity is given."[3] Id. at 1211. When published information is "in no conceivable way related to the 'incident of public concern' or current 'drama,'" the newsworthiness exception does not apply. See id.

---

[3] For instance, courts applying Georgia law have dismissed invasion of privacy claims related to a broad range of content based on the newsworthiness exception, even years after the underlying incident of public interest. See, e.g., Somerson v. World Wrestling Ent., Inc., 956 F. Supp. 2d 1360, 1366 (N.D. Ga. 2013) (website featuring videos of plaintiff's wrestling matches from 1986 and 1987 held newsworthy after his retirement in 2012); Alexander v. News Corp., No. CV-203-158, 2004 WL 3591340 (S.D. Ga. March 19, 2004) (plaintiff's status as confidential informant prior to 1993 a matter of public interest in memoir published several years later); Thoroughbred Legends, LLC, 2008 WL 616253, at *11 (motion picture regarding events decades earlier concerning the famous racehorse "Ruffian" found of public interest); cf. Campbell v. Seabury Press, 614 F.2d 395, 397 (5th Cir. 1980).

For example, in Toffoloni, the Eleventh Circuit analyzed the newsworthiness of a defendant's publication of nude photographs of a woman professional wrestler who had been murdered by her husband. Toffoloni, 572 F.3d at 1204. The nude photographs predated her death by twenty years. Id. After the woman's murder, the defendant published her nude photographs alongside a biographical piece about her career. Id. at 1209. The Eleventh Circuit noted that "[t]he biographical piece, in and of itself, certainly fails within the newsworthiness exception." Id. However, the question before the court was whether "a brief biological piece can ratchet otherwise protected, personal photographs into the newsworthiness exception." Id. The Eleventh Circuit held that it could not. Id. In its analysis, the Eleventh Circuit distinguished the case from the Supreme Court of Georgia opinion in Waters v. Fleetwood. Id. (citing 91 S.E.2d 344).

> In Waters, a newspaper published photographs of a murdered child's deceased body, as illustrative of an article about her murder and the subsequent investigation. [The woman's] situation is distinct from the situation in Waters. In Waters, the offensive photographs were of the child's deceased body, and as such were directly related to the "incident of public interest"—the child's death. . . . [Here, the nude photographs of the woman] had no relation to her death. Her aspiring nude modeling career at no time developed into an incident of public concern, and for good reason—[she] sought the destruction of all of those images.

Id. Thus, the Eleventh Circuit held that the nude photographs were "merely incidental" to the biography of the woman's life and therefore did not "conceptually"

relate "to the incident of public concern . . . during which [the woman] was rendered, against her will, the subject of public scrutiny." Id. at 1209, 1212.

In contrast, here, Defendant Glass's publication of Plaintiff's likeness in the Docuseries is conceptually related to the incident of public concern of Herron's criminal actions, which have rendered Plaintiff, albeit unwillingly, the subject of public scrutiny. See Toffoloni, 572 F.3d at 1211; Ramsey, 297 S.E.2d at 95; see also Torrance, 636 S.E.2d at 741, 747 (holding that the "circumstances" surrounding the death of a man who drowned were newsworthy and barred plaintiff's invasion of privacy claims, which were based on defendant's publication of her photograph seven years after the man's death in an article discussing that he was a "convicted peeping Tom" and looked through her window the night before his death when she was 17 years old). Accordingly, because Plaintiff's likeness has "some reasonable proportion" to the events of Herron's criminal activity, Plaintiff's likeness in the Docuseries is newsworthy. Toffoloni, 572 F.3d at 1211; Torrance, 636 S.E.2d at 747.

In response to Defendant's Motion for Reconsideration, Plaintiff contends that even if her appearance in the Docuseries is newsworthy, the Court should not dismiss her appropriation of likeness claim due to Defendant Glass's First Amendment waiver. [Doc. 48 at 5]. The Court's MTD Order held that the Complaint "plausibly alleges that Defendant Glass waived its First Amendment rights as to the publication" of Plaintiff's UNG Presentation. [See Doc. 37 at 33–34]. Thus, Plaintiff

asserts that Defendant Glass is precluded from publishing Plaintiff's UNG Presentation regardless of the newsworthiness of her likeness. [Doc. 48 at 5].

In reply, Defendant Glass argues that the newsworthiness exception is a distinct feature of Georgia invasion of privacy torts and thus not waivable. [Doc. 50 at 9]. Specifically, Defendant Glass contends that the Georgia newsworthiness exception "exists separate and apart from any defenses that may be available under the First Amendment" because some Georgia courts have dismissed invasion of privacy claims based on newsworthiness without explicit mention of the First Amendment. [See id. at 9–10]. Defendant Glass therefore urges the Court to dismiss Plaintiff's appropriation of likeness claim regardless of Defendant Glass's alleged First Amendment waiver. [Id.]

The Court is unpersuaded by Defendant Glass's argument. The weight of authority suggests that the newsworthiness exception is not a free-standing concept. Rather, it inextricably arises from the First Amendment and the Georgia state constitution's protection of the freedom of speech and of the press. See, e.g., Toffoloni, 572 F.3d at 1208 (11th Cir. 2009) ("[W]here [a] publication is newsworthy, the right to publicity gives way to freedom of the press"); Martin Luther King, Jr., Ctr. for Soc. Change, Inc. v. Am. Heritage Prods., Inc., 296 S.E.2d 697, 703 (Ga. 1982) ("[T]he courts in Georgia have recognized the rights of private citizens . . . not to have their names and photographs used for the financial gain of

the user without their consent, where such use is not authorized as an exercise of freedom of the press"); Crawl v. Cox Enterprises, No. CIV. 00VS002088F, 2001 WL 849222, at *6 (Ga. State Ct. Mar. 13, 2001) ("Since the Georgia Supreme Court's recognition of a right of privacy, the Court has emphasized that it must "'in some particulars yield to the right of speech and the press.'" (quoting Pavesich v. New England Life Ins. Co., 50 S.E. 68, 74 (Ga. 1905))); Tucker, 397 S.E.2d at 500 ("[The] right of privacy is unquestionably limited by the right to speak and print."). Thus, in its discretion, the Court declines to reconsider its ruling on Plaintiff's appropriation of likeness claim.[4] See Reid v. BMW of N. Am., 464 F. Supp. 2d 1267, 1270 (N.D. Ga. 2006) (an error is not "clear," so as to support a motion for reconsideration, if the legal issues are "at least arguable").

## III.    Plaintiff's Motions

Plaintiff filed two motions seeking ways to appeal the Court's MTD Order as it pertains to former Defendants ABC and Hulu while this action against Defendant Glass is ongoing. [See Docs. 38, 44]. First, Plaintiff filed her Motion for Certificate

---

[4] Defendant Glass's reliance on the Georgia trial court opinion in Crawl v. Cox Enterprises is unpersuasive. In that case, there was no viable argument that the defendant had waived its freedom of speech or press rights because the court found that the plaintiff failed to state a claim for promissory estoppel. See 2001 WL 849222, at *7 (dismissing plaintiff's promissory estoppel claim). Here, however, Plaintiff's breach of contract and promissory estoppel claims survived Defendant Glass's motion to dismiss. [Doc. 37]. Additionally, the Court is unmoved by Defendant Glass's reliance on Thoroughbred Legends, LLC, 2008 WL 616253. There, the court merely discussed the newsworthiness exception separately from the First Amendment protection of freedom of expression. See id. at *10–12. Further, there was no argument of waiver in that case. See id.

of Immediate Review. [Doc. 38]. In that motion, Plaintiff requests a certification for immediate review under 28 U.S.C. § 1292(b). [Id. at 8]. In response, Defendant Glass points out that the proper procedural vehicle for Plaintiff's desired relief is likely Federal Rule of Civil Procedure 54(b), because she does not seek review of the entire Order, but rather of discrete issues pertaining to former Defendants ABC and Hulu. [Doc. 42 at 5]; see DeMelo v. Woolsey Marine Indus., Inc., 677 F.2d 1030, 1032 (5th Cir. 1982). Plaintiff did not reply, seemingly abandoning her argument. See Singh v. Royal Caribbean Cruises Ltd., 576 F. Supp. 3d 1166, 1192 (S.D. Fla. 2021). Plaintiff then filed her instant Motion for Entry of Judgment Pursuant to Federal Rule of Civil Procedure 54(b), which seeks essentially the same relief as her previous motion. [Doc. 44]. Accordingly, the Court denies as moot Plaintiff's Motion for Certificate of Immediate Review and discusses her Rule 54(b) Motion below.

Federal Rule of Civil Procedure 54(b) provides:

> When more than one claim for relief is presented in an action, . . . or when multiple parties are involved, the [district] court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Fed. R. Civ. P. 54(b). "A district court must follow a two-step analysis in determining whether a partial final judgment may properly be certified under Rule 54(b). First, the court must determine that its final judgment is, in fact, both 'final'

16

and a 'judgment.'" <u>Lloyd Noland Found., Inc. v. Tenet Health Care Corp.</u>, 483 F.3d 773, 777 (11th Cir. 2007). Second, the court "must then determine that there is no 'just reason for delay' in certifying it as final and immediately appealable. This inquiry is required because '[n]ot all final judgments on individual claims should be immediately appealable.'" <u>Id.</u> (internal citation omitted). "The district court must act as a 'dispatcher' and exercise its discretion in certifying partial judgments in consideration of 'judicial administrative interests'—including 'the historic federal policy against piecemeal appeals'—and 'the equities involved.'" <u>Id.</u> (citation omitted).

> The [equities] factor serves to limit Rule 54(b) certification to instances in which immediate appeal would alleviate some danger of hardship or injustice associated with delay.
>
> As these factors will often suggest contrary conclusions, Rule 54(b) certifications "must be reserved for the *unusual* case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties." Recognizing that such circumstances will be encountered only *rarely*, [the Eleventh Circuit] ha[s] previously counseled district courts to exercise the limited discretion afforded by Rule 54(b) conservatively.

<u>Ebrahimi v. City of Huntsville Bd. of Educ.</u>, 114 F.3d 162, 166 (11th Cir. 1997) (emphasis added). "[T]he decision to certify is committed to the sound judicial discretion of the district court" and "will not [be] disturb[ed] . . . unless it [is] clearly unreasonable." <u>Id.</u>

Here, it is undisputed that the Court's MTD Order is both final and a judgment as to former Defendants ABC and Hulu. Thus, the Court must consider whether there is no "just reason for delay" in certifying the MTD Order as final and immediately appealable by weighing the judicial administrative interest at stake and the equities involved. Lloyd, 483 F.3d at 777. Plaintiff argues that judicial administrative interests favor a Rule 54(b) certification because this case is in the early stages of litigation and appealing her claims against former Defendants ABC and Hulu would enhance "efficiency" by avoiding the possibility of the Court trying two cases rather than one if the Eleventh Circuit were to reverse the dismissal of former Defendants ABC and Hulu. [Doc. 44 at 7]. Additionally, Plaintiff contends that the equities also favor a Rule 54(b) certification because "her damages from Hulu's streaming and ABC and Hulu's liabilities are continuing to accrue with every broadcast of the Docuseries." [Id. at 8].

In response, Defendant contends there are substantial reasons to delay in entering judgment against former Defendants ABC and Hulu at this time. [Doc. 47 at 2]. Defendant argues that the judicial administrative interests weigh against a Rule 54(b) certification because Plaintiff's pending claims against Defendant Glass are legally and factually intertwined with Plaintiff's dismissed claims against former Defendants ABC and Hulu. [Id. at 3]. Additionally, Defendant argues that the fact that this case is in its infancy does not alone warrant immediate appeal and that the

possibility of reversal is a "normal consequence[] of litigation." [<u>Id.</u> at 6]. Finally, Defendant contends that Plaintiff's claim that she will continue to suffer harm "puts the cart before the horse, because Plaintiff is entitled to no presumption that she either has or will continue to suffer any harm." [<u>Id.</u> at 6].

Upon review, the Count finds that there is just reason for delay and that Rule 54(b) certification is improper. First, the Court does not find that allowing immediate appeal would promote the interests of judicial administration. As discussed by the Eleventh Circuit in <u>Ebrahimi</u>, here, the same operative facts serve as the basis for each legal theory advanced by Plaintiff. <u>See</u> 114 F.3d at 167. For instance, Plaintiff contends that former Defendants ABC and Hulu are bound by Defendant Glass's waiver of its First Amendment rights, which Defendant Glass allegedly waived through contract or promissory estoppel. However, Plaintiff's breach of contract and promissory estoppel claims have not yet been adjudicated. Thus, if the Court were to grant immediate review, there is a risk that the Eleventh Circuit "would be required to relearn the same set of facts if and when the case returned to [it] on appeal" from any final judgment related to those claims. <u>See</u> <u>id.</u>; <u>see also</u> <u>In re Fla. Cement & Concrete Antitrust Litig.</u>, No. 09-23187-CIV, 2011 WL 13123611 at *3 (S.D. Fla. Apr. 15, 2011) (noting that "the ongoing proceedings in this [c]ourt may affect or outright moot the appeal Plaintiffs seek").

Second, the Court does not find that Plaintiff's claimed accrual of damages outweighs the interest of efficient judicial administration. See In re Fla. Cement, 2011 WL 13123611 at *3 n.4 (noting that plaintiffs' delayed potential opportunity to recover damages did not justify a Rule 54(b) certification). In short, the Court does not find that this is the "unusual" case that justifies a piecemeal appeal at the risk of "overcrowding the appellate docket." See Ebrahimi,114 F.3d at 167. Accordingly, the Court denies Plaintiff's motion. [Doc. 44].

## IV.    Conclusion

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Certificate of Immediate Review [Doc. 38] and Motion for Entry of Judgment Pursuant to Federal Rule of Civil Procedure 54(b) [Doc. 44]. Additionally, the Court **GRANTS IN PART AND DENIES IN PART** Defendant Glass's Motion for Reconsideration. [Doc. 43]. Upon reconsideration, the Court **VACATES IN PART AND UPHOLDS IN PART** its August 16, 2024 Order. [Doc. 37]. Specifically, the Court vacates its discussion that Plaintiff's appearance in the Docuseries was not newsworthy. However, the Court upholds its ruling on Plaintiff's appropriation of likeness claim (Count I).

Finally, the Court **LIFTS THE STAY** in this matter. [Doc. 46]. The Court **DIRECTS** the Parties to file a Joint Preliminary Report and Discovery Plan in

accordance with this District's Local Rules within 30 days of the date of this order.

<u>See</u> LR 16.2, NDGa.

     **SO ORDERED**, this 14th day of January, 2025.

_____
Eleanor L. Ross
United States District Judge
Northern District of Georgia